UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISON

SHELLEY GARRETT,

       Plaintiff,

Case No. 17-13028

Honorable Nancy G. Edmunds

v.

MERCEDES-BENZ FINANCIAL
SERVICES USA LLC and DAWN
CARPENTER,

       Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [16],
AND GRANTING DEFENDANTS' MOTION TO STRIKE [36]**

This retaliation lawsuit arises out of Plaintiff's termination from Mercedes-Benz Financial Services approximately two years after she complained to Human Resources about inappropriate behavior by her supervisor and approximately six months after she complained about retaliation. Plaintiff maintains that Defendants Mercedes-Benz Financial Services and Dawn Carpenter retaliated against her, in violation of her rights under Title VII, by terminating her employment as a direct and proximate result of her protected activities. Defendants argue that Plaintiff cannot establish a prima facie case of retaliation. They further argue that the evidence shows that Plaintiff's continued, unprofessional behavior toward her coworker Lisa Sesny triggered their decision to fire her.

1

Currently before the Court is Defendants' motion for summary judgment and Defendants' motion to strike Plaintiff's post-briefing affidavit.  (Dkt. # 16; Dkt. # 36).  For the reasons stated below, this Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment, and GRANTS Defendants' motion to strike.

## I.    FACTS

Defendant Mercedes-Benz Financial Services USA LLC ("MBFS"), a subsidiary of Daimler AG, is an automotive finance company based in Farmington Hills, Michigan.  Plaintiff Shelley Garrett ("Plaintiff") began working for DaimlerChrysler AG in 2000.  (Dkt. # 24-41, Pg ID 2136-37).  Plaintiff was originally assigned to the legal department of Chrysler Financial Company LLC.  (Dkt. # 16-2, Pg ID 105).  By the time Daimler and Chrysler separated in 2007, Plaintiff was working for MBFS.  *Id.* at Pg ID 229.  After the separation, she stayed with MBFS/Daimler AG.  *Id.* at Pg ID 227-28.

At MBFS, Plaintiff worked in sales support in the marketing department for five years.  *Id.* at Pg ID 191.  In October 2013, she was transferred to the insurance department and began reporting to Donald Berry, U.S. Insurance Manager.  *Id.* at Pg ID 114-15.  Insurance Specialists Lisa Sesny and Amy Trump also reported to Berry.  (Dkt. # 16-10, Pg ID 495).  Operations Manager Dawn Carpenter reported directly to Berry's manager, Chris Weinig.  *Id.* at 495-97.  According to her deposition testimony, Plaintiff started documenting workplace issues regarding her interactions with Berry, Sesny, and Trump soon after she started working in the insurance department.  (Dkt. # 16-2, Pg ID 243-307).

On July 18, 2014, Plaintiff communicated concerns about inappropriate behavior by Berry to Executive VP of Marketing Geoff Robinson.   *Id.* at Pg ID 132-33.   One of these concerns was an alleged ongoing affair between Berry and Carpenter, which was the first time Robinson had heard of the rumor.   (Dkt. # 16-4, Pg ID 348).   This conversation led to a meeting between Plaintiff and Human Resources ("HR") Director Mary Hughes as well as HR Representative Amy Atkinson on July 25, 2014.  (Dkt. # 16-2, Pg ID 133-34).   Other misconduct by Berry reported by Plaintiff (and recorded by HR) at this meeting includes:

- In June 2013, Berry flipped off Lisa Rosenfeld, his colleague at Mercedes-Benz USA, LLC, and called her a "bitch," while he muted the phone conversations with her.  *Id.* at Pg ID 115; Dkt. # 34-2.

- In December 2013, Berry flipped off Amy Goetschius, a Region Insurance Manager, and called her a "fucking bitch," while he muted the phone conversation with her.  (Dkt. # 16-2, Pg ID 115; Dkt. # 34-2).

- On February 25, 2014, Berry said that he could not wait until "that fucking guy [Region Insurance Manager, Jon Adams] leaves."  (Dkt. # 16-2, Pg ID 130-31; Dkt. # 34-2).

- On June 9, 2014, Berry called Kathy Chabot, Robinson's executive assistant, a "bitch" after reading an e-mail from her.  (Dkt. # 16-2, Pg ID 131-32; Dkt. # 34-2).

In her notes on workplace incidents, Plaintiff had also recorded Berry referring to Chris Kirby as a "fucker" on July 21, 2014.  (Dkt. # 16-2, Pg ID 132, 259).  According to their respective declarations, neither Robinson nor Hughes understood these complaints to be about gender discrimination.  (Dkt. # 16-5, Pg ID 360; Dkt. # 16-7, Pg ID 421).

Nevertheless, MBFS's Equal Employment Opportunity Harassment Policy requires all harassment complaints to be investigated.  (Dkt. # 24-11, Pg ID 1445-46).  Under the Policy, harassment includes "verbal & written communication . . . visual displays . . . and retaliation that denigrates or shows hostility . . . towards an individual because of his or her status as protected by law and that unreasonably interferes with that individual's work performance or creates an intimidating work environment."  *Id.* at Pg ID 1445.  On July 30, 2014, Hughes sent an e-mail to Daimler AG's Business Practice Office ("BPO") requesting to begin an investigation into Berry's conduct.  (Dkt. # 34-3).

In October 2014, HR facilitated a series of meetings to address relationship issues in the insurance department.  (Dkt. # 16-2, Pg ID 140; Dkt. # 16-19, Pg ID 1117-29).  Plaintiff believes that Berry arranged these meetings after she expressed her concerns to him about the team generally.  (Dkt. # 16-2, Pg ID 140).  In addition to group meetings, HR met individually with members of the insurance department.  On October 20, 2014, Plaintiff again met with HR, specifically, with Tara Hughes and Atkinson.  *Id.* at Pg ID 154-55.  During this meeting, Plaintiff reiterated her previous complaints about Berry and reported additional incidents.  *Id.*  According to her deposition testimony, Plaintiff heard from a coworker that Berry told the coworker that Plaintiff was on Berry's "top five list of women that he would sleep with."  *Id.* at Pg ID 156.

During this same time period, BPO asked Mary Hughes to perform a local investigation into Berry's conduct.  (Dkt. # 16-16, Pg ID 375).  Additional allegations against Berry include that he allegedly slapped Carpenter on the butt at a field sales conference sometime between July and October 2014.  (Dkt. # 16-2, Pg ID 155-56, 160).  Although Plaintiff did not witness the event in person, she saw a photo that Lisa Rosenfeld

took showing Berry's hand on Carpenter's "butt area." *Id.* at Pg ID 156. According to Atkinson's deposition testimony, Sesny also reported this incident during her individual meeting with HR in October 2014. (Dkt. # 16-8, Pg ID 447). Unlike Plaintiff, Sesny characterized it as a butt grab. *Id.* Sesny also reported that she heard Berry say that Ashley could do what she wants at work because she is pretty. *Id.* at Pg ID 448. The result of HR's local investigation was a written warning to Berry regarding his use of profanity, inappropriate gestures, and negativity with team members, dated October 29, 2014. (Dkt. # 34-6; Dkt. # 16-6, Pg ID 370).

In a January 2015 meeting, Trump informed Weinig about the rumored affair between Berry and Carpenter. (Dkt. # 16-2, Pg ID 165-66). Weinig asked Berry and Carpenter about the allegation but both denied it. (Dkt. # 16-13, Pg ID 786). Weinig took them at their word and did not investigate further. *Id.* After Plaintiff filed this lawsuit, an attorney for MBFS investigated this accusation and determined that Berry and Carpenter had lied; their romantic relationship began in September 2013 and existed throughout the time period that Plaintiff worked in the insurance department. (Dkt. # 42-1; Dkt. # 24-18, Pg ID 1570).

In October 2015, the insurance department was reorganized, with the responsibilities of Plaintiff and Sesny being reallocated between them. (Dkt. # 16-11, Pg ID 556-57). According to Carpenter's deposition testimony, Plaintiff became the "go-to-person for the field," whereas Sesny focused on "strategic initiatives and working with Don on putting together presentations." *Id.* at Pg ID 557. Plaintiff also began directly reporting to Carpenter instead of Berry. *Id.* Carpenter thought the new responsibilities would help advance Plaintiff closer to her goal of being in the field. *Id.* Plaintiff, however,

5

saw the change as a demotion because her previous position (before joining the insurance department) was in sales support.  (Dkt. # 16-2, Pg ID 168).  Plaintiff's compensation and job title stayed the same, but she viewed her new role as "lesser of a job as far as job responsibilities."  *Id.*

Because Plaintiff initiated the complaint against Berry and was now reporting to Carpenter, the person Berry was having an affair with, Plaintiff worried that this change of role was retaliation for her previous complaints against Berry.  Therefore, on October 19, 2015, she complained about the situation to Lori Ballard, who had replaced Atkinson in HR.  *Id.* at Pg ID 186.  According to her deposition testimony, Plaintiff told Ballard that Trump had informed Weinig about the affair, and that Plaintiff had been the "whistleblower" who complained about Berry's conduct initially.  *Id.* at Pg ID 165-66, 178.  In response to Plaintiff's complaint, according to an e-mail to Berry and Carpenter, Ballard told Plaintiff not to take the change personally.  (Dkt. # 24-21, Pg ID 1698-99).  Ballard also communicated to Berry and Carpenter that they could reorganize the insurance group at their discretion.  *Id.*  Ballard's e-mail to Berry and Carpenter contained no mention of the retaliation complaint.  *See id.*

After a bad performance review for 2015, Berry's employment at MBFS was terminated in February 2016.  (Dkt. # 16-13, Pg ID 790-91; Dkt. # 16-10, Pg ID 489).  According to Weinig, the conduct that led to Berry's written warning, as well as poor communication with the sales team, were the reasons for his dismissal.  (Dkt. # 16-13, Pg ID 790-91).  According to Weinig's declaration, neither Plaintiff's complaint nor the 2015 written warning were mentioned to Berry when he was terminated.  (Dkt. # 16-14, Pg ID 832).  Carpenter testified at her deposition that she was not aware of the official

6

reason why Berry was terminated, only that it was due to leadership and trust issues. (Dkt. # 16-11, Pg ID 578). She testified that it was not until this litigation that she became aware of HR complaints about her relationship with Berry. *Id.* at Pg ID 538. On August 1, 2016, Wen Liu became U.S. Insurance Senior Manager, taking over Berry's former role. (Dkt. # 16-16, Pg ID 926).

Although HR complaints at MBFS are supposed to be kept anonymous, Plaintiff points to signs that other MBFS employees knew that Plaintiff initiated the July 2014 complaint against Berry. According to Plaintiff's deposition, soon after Berry was fired, sales and marketing executive Brian Fulton told her, "you've got to be glad that Don Berry is no longer with the company." (Dkt. # 16-2, Pg ID 177). Additionally, Plaintiff confronted another coworker who was openly telling others that Plaintiff was the reason that Berry got fired. *Id.* at Pg ID 170.

After Berry's termination, Plaintiff and Sesny regularly complained to Carpenter about each other. (Dkt. # 16-11, Pg ID 580). These problems led to several group and one-on-one meetings facilitated by Weinig and Carpenter to hear each side's story and stress the importance of professional behavior. *Id.* Despite these efforts, there was an incident between Plaintiff and Sesny on March 24, 2016. *Id.* at Pg ID 580-83. According to Carpenter's deposition testimony, Intern Spencer Frania was going to be covering for Plaintiff while she was on vacation. *Id.* at Pg ID 580. Plaintiff allegedly raised her voice at the intern and Sesny in an aggressive manner when Sesny was providing the intern guidance related to sales support, such as providing him phone numbers he might need. *Id.* at Pg ID 581. Plaintiff was upset that Sesny had not directed the intern to her and that the intern had not asked her for help with sales support, which was her assigned role. *Id.*

7

at Pg ID 581.  Carpenter testified that Plaintiff became very red and angry and that she was flailing her arms and yelling.  *Id.*  Carpenter further testified that the intern complained to her that Plaintiff made him feel very uncomfortable.   *Id.* at Pg ID 582.   Plaintiff's deposition testimony regarding the March 24 incident was limited.  She testified that Sesny asked Frania whether he had any questions regarding covering for Plaintiff, and Frania went over to Sesny desk.  Plaintiff acknowledged that she was disappointed that Frania did not come to her instead, and that this "definitely caused problems."  (Dkt. # 16-2, Pg ID 196).

On April 5, 2016, when Plaintiff returned from her vacation, Carpenter met with her to discuss the incident and her unprofessional behavior.  (Dkt. # 16-11, Pg ID 584-85, 589).  Plaintiff stressed her continued frustration with Sesny.  *Id.* at Pg ID 585.  On April 7, Sesny reported this incident, along with her continued difficulties with Plaintiff, to Ballard in HR.  (Dkt. # 16-12, Pg ID 642-43).  The following day, in an e-mail to Carpenter and Weinig, Ballard recommended that Plaintiff be placed on a Performance Improvement Plan ("PIP").  (Dkt. # 16-19, Pg ID 1112).  According to MBFS's PIP Policy, a PIP is warranted if the problematic behavior does not improve after "one-on-one counseling," or when an employee fails to meet performance standards for two consecutive months or two out of six months, or has an inconsistent or insufficient rating on a mid-year or annual performance review.  (Dkt. # 24-39, Pg ID 2043).  On April 19, Plaintiff was placed on a PIP, which Carpenter testified she prepared with input from Ballard and Weinig.  (Dkt. # 16-11, Pg ID 588).  The document states that Plaintiff had "repeatedly shown disregard for input from team members and management," and that

she was not "tak[ing] accountability for her interactions with others."  (Dkt. # 24-26, Pg ID 1870-73).  Specific examples were listed including:

- Sales support e-mails containing conflict between Plaintiff and Sesny in early March 2016. *Id.* at Pg ID 1871. Carpenter testified that one of these e-mail chains related to Plaintiff lying to Sesny about addressing a coworker's question and feeling like Sesny was "checking up" on her.  (Dkt. # 16-11, Pg ID 589).

- The incident with Sesny and the intern on March 24, 2016 and Plaintiff's resistance to feedback afterwards.  (Dkt. # 24-26, Pg ID 1871).

- Complaints from SafeGuard, a vendor relationship that Plaintiff was in charge of managing, regarding Plaintiff's aggressive demeanor.  *Id.*; Dkt. # 16-11, Pg ID 590-91.

Upon receiving the PIP, Plaintiff again complained to Ballard of retaliation based on her reporting Berry's misconduct and Carpenter's continued romantic relationship with Berry.  (Dkt. # 24-27, Pg ID 1875-76; Dkt. # 24-28, Pg ID 1878).  Ballard relayed Plaintiff's retaliation concern to Mary Hughes, who said the affair accusation was unfounded based on a prior investigation.  (Dkt. # 16-12, Pg ID 626-27; Dkt. # 24-28, Pg ID 1878).  HR Manager Carrie Castelvetere, Ballard's manager, testified at her deposition that she expected Ballard to gather more information about Plaintiff's retaliation complaint.  (Dkt. # 16-18, Pg ID 1032).  However, she did not recall if an investigation was ever conducted, and she has no records related to one.  *Id.* at Pg ID 1029.  Regardless, Plaintiff successfully completed the PIP on June 21, 2016 after Carpenter determined that she had sufficiently improved.  (Dkt. # 24-26, Pg ID 1872-73).

Subsequently, there was another incident between Plaintiff and Sesny regarding a change in California licensing requirements, which affected the insurance department's forms.  (Dkt. # 16-2, Pg ID 215-18; Dkt. # 24-32, Pg ID 1944-46).  At a meeting on November 1, 2016, Plaintiff and Carpenter learned of the potential change.  (Dkt. # 16-2, Pg ID 215).  Plaintiff then received confirmation of the change at a conference call on November 3.  On November 4, Plaintiff communicated this licensing change to the rest of her team on a conference call.  *Id.*  Plaintiff, Sesny, Trump, and Frania participated in the conference call from the same location.  *Id.* at Pg ID 217.

According to Plaintiff, Sesny became visibly upset and red and "frantically started texting" as soon as Plaintiff communicated the change.  *Id.*  Plaintiff testified that after the conference call ended, Sesny was "outraged" and "pitch red."  *Id.* at Pg ID 218.  According to Plaintiff, Sesny said, "Shelley, you've got to let me know when these changes happen right away."  *Id.*  Plaintiff explained that she just found out about the change and was now letting the team know.  *Id.*  According to Plaintiff, Sesny continued yelling.  *Id.*  Plaintiff then implemented a three-step approach she had been trained on for dealing with Sesny when she had a negative tone.  *Id.*  First, Plaintiff acknowledged Sesny's tone by indicating that she was yelling and that Plaintiff felt she was coming at her.  *Id.*  Sesny responded that Plaintiff was taking things too personally.  *Id.*  Second, Plaintiff let Sesny know that they needed to get management involved in order to have further discussions, indicating that Carpenter found out about the licensing change at the same time as Plaintiff.  *Id.*  Sesny continued to communicate her frustration.  *Id.*  And third, Plaintiff let Sesny know that she was removing herself from the situation and left the room to avoid conflict.  *Id.*

At her deposition, Sesny testified that she had not previously been informed of the change, despite being in charge of the department's forms.  (Dkt. # 16-15, Pg ID 914). Because of this responsibility, Sesny requested to be updated on any form changes as soon as possible going forward.  *Id.* at Pg ID 910.  She testified that she made this request to the entire room after the conference call ended.  *Id.*  Sesny further testified that Plaintiff abruptly left the room after the call shouting at her, "You're harassing me."  *Id.*  Trump's deposition testimony affirms Sesny's version of story; Trump believes Plaintiff overreacted.  (Dkt. # 16-17, Pg ID 1008).  Plaintiff and Sesny both went to Weinig's office after the incident and gave their different accounts of the event.  (Dkt. # 16-13, Pg ID 817).  According to his deposition testimony, Weinig's general impression was that each felt the other was trying to do her job and that Sesny felt more under attack.  *Id.* at Pg ID 817, 822.  Later that day, Sesny decided to bring an official complaint against Plaintiff for years of alleged harassment. (Dkt. # 16-19, Pg ID # 1131).

The following Monday, November 7, Weinig, Carpenter, Ballard, and Liu had a meeting to discuss Plaintiff's behavior during the incident.  (Dkt. # 16-12, Pg ID 624). According to Carpenter's deposition testimony, Weinig initially suggested issuing a written warning to Plaintiff.  (Dkt. # 16-11, Pg ID 609).  Given the behaviors brought to Plaintiff's attention through the PIP, Carpenter told Weinig that she felt that Plaintiff had already received a written warning.  *Id.*  Carpenter testified that Ballard agreed and voiced that, based on prior history and all of the times that management and HR had talked with Plaintiff, Plaintiff's behavior would not change.  *Id.*

According to Weinig's deposition testimony, management and HR ultimately decided to terminate Plaintiff's employment because they believed Plaintiff's behavior

was not going to change and that she was hurting team morale. (Dkt. # 16-13, Pg ID 817). In his declaration, Weinig asserts that he was the ultimate decision maker, that Carpenter was not a decision maker, and that there was no mention of Berry's misconduct or Plaintiff's complaints during the discussion preceding Plaintiff's termination. (Dkt. # 16-14, Pg ID 832-33). In Ballard's deposition, she testified that Weinig, the senior manager, was the ultimate decision maker. (Dkt. # 16-12, Pg ID 624). According to Liu's deposition, Weinig, Ballard, and he made this decision, and Carpenter was not a decision maker. (Dkt. # 16-16, Pg ID 938-39). Plaintiff was notified of her termination at a meeting with Liu, Ballard, and Weinig on November 8, 2016. Plaintiff does not remember a specific reason being given for the termination, whereas according to his deposition testimony, Liu remembers Weinig saying it was because of the incident with Sesny on November 4. (Dkt. # 16-2, Pg ID 224-25; Dkt. # 16-16, Pg ID 950). Defendants never documented the reason for Plaintiff's termination in writing.

## II.    SUMMARY JUDGMENT STANDARD

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III.   ANALYSIS

### A. Time Bar in Plaintiff's Employment Application

Although Chrysler Corporation ("CC") and Daimler-Benz AG merged in 1998, when Plaintiff applied for a job in February 2000, her employment application included a six-month time bar for any lawsuit arising out of Plaintiff's employment with "Chrysler Corporation or any of its subsidiaries." (Dkt. # 24-41, Pg ID 2136-37). Relying on *Bil-Gel Co. v. Thoma*, 345 Mich. 698 (1956), Defendants claim that Plaintiff "understood… [she] was dealing" with DaimlerChrysler AG and not CC when completing her employment application. However, there is a genuine dispute as to whether Plaintiff understood that she was agreeing to a time bar with "DaimlerChrysler AG or any of its subsidiaries." In the *Bil-Gel Co.* case, the contract was enforceable because the identity of the contracting party "could not possibly have been in doubt at any time." *Id.* at 705 (quoting *St. Matthew's Evangelical Church v. U.S. Fid. & Guar. Co.*, 222 Mich. 256, 262 (1923)). This high standard was met in *Bil-Gel Co.* when the abbreviation "Inc." was erroneously included in the plaintiff's name on the written instrument in dispute. *Id.* at 704-05.

The distinction between CC and DaimlerChrysler AG is more substantial in the current case. First, the entire employment application indicates CC as Plaintiff's

prospective employer.  (Dkt. # 24-41, Pg ID 2136-37).  Therefore, unlike in *Bil-Gel Co.*, using the wrong party name does not appear to be a mistake here.  Additionally, after the merger, CC continued to exist as a wholly owned subsidiary of DaimlerChrysler AG called DaimlerChrysler Corporation ("DCC").  (Dkt. # 16-3, Pg ID 325).  In anticipation of the merger with Daimler-Benz AG, CC renamed itself DCC, by filing the change with the State of Michigan on November 19, 1998.  (Dkt. # 24-42, Pg ID 2139-40).  Because it continued to exist as a separate legal entity, CC/DCC was capable of entering into its own contractual agreements.  *See Roof v. Conway*, 133 F.2d 819, 823 (6th Cir. 1943) (noting that stock ownership of a subsidiary by its parent does not merge them into one corporation so as to make the contract of one binding upon the other).  Because CC/DCC continued Chrysler's operations after the merger, Plaintiff could have reasonably interpreted the application language to mean that she was applying for a job with CC/DCC and that the time bar language was correct as written.  Because the names of the organizations are similar, Plaintiff's initial assignment to Chrysler Financial Company LLC ("CFC"), another subsidiary of DaimlerChrysler AG, supports this interpretation.  *See* Dkt. # 16-2, Pg ID 105; Dkt. # 16-3, Pg ID 325.

Even if the language of the time bar was ambiguous and the intentions of the parties were unclear, the language would be interpreted against the drafter of the contract under the doctrine of *contra proferentem*.  *See, e.g.*, *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 470-72 (2003) (finding the rule of *contra proferentem* should be used as a "tie-breaker" when the conventional means of contract interpretation have been exhausted).  As a large, sophisticated business who drafted the employment application, DaimlerChrysler AG was in a better position to avoid confusion about which entities the

time bar applied to.  Seeing as the merger between CC and Daimler-Benz occurred in 1998 and Plaintiff applied for a job in 2000, DaimlerChrysler AG had ample time to correct its employment applications and/or to expand the reach of the time bar provision if that was its intention.

Applying the time bar language to the Plaintiff's employment history, she did not work for CC or any of its subsidiaries during all times relevant to this lawsuit.    According to the declaration of Steven Poling, Assistant Secretary at MBFS,:

- In 2001, while Plaintiff was working at CFC, it was merged into DaimlerChrysler Services North America LLC ("DCSNA").  (Dkt. # 16-3, Pg ID 326).

- On January 1, 2006, DCSNA merged into DaimlerChrysler Financial Services Americas LLC ("DCFSA").  *Id.*

- On March 16, 2007, DCFS USA LLC ("DCFS") was created as a separate subsidiary of DaimlerChrysler AG.  *Id.*

- On August 1, 2007, Plaintiff was transferred to DCFS.  *Id.*  This is shown as her "Hire / Rehire Date" on her MBFS 2016 Compensation Statement.  (Dkt. # 24-2, Pg ID 1216).

- On August 3, 2007, DaimlerChrysler AG sold a majority interest in DCSNA, along with the rest of the Chrysler group of companies, to private equity firm Cerberus Capital Management L.P.  (Dkt. # 16-3, Pg ID 326).  The Chrysler group of companies was held under a new company called Chrysler LLC.  The subsidiary Plaintiff worked for, DCFS, was not included in this sale.  *Id.*

- In October 2007, DaimlerChrysler AG changed its name to Daimler AG.  *Id.*

- Lastly, on November 15, 2010, DCFS changed its name to Mercedes-Benz Financial Services USA LLC, a named Defendant in this lawsuit. *Id.*

Throughout this series of organization changes, DCFS/MBFS was never a subsidiary of CC/DCC.

Furthermore, CC/DCC no longer exists. On April 30, 2009, Chrysler LLC, then known as Old Carco LLC, filed for Chapter 11 bankruptcy protection.[1] On the same day, Chrysler agreed to sell "the principal operating assets" of Old Carco LLC to a new company, Chrysler Group LLC, and have it "assume certain . . . liabilities." (Dkt. # 24-50, Pg ID 2193). After bankruptcy court approval, this transaction was completed on June 10, 2009 and included the former CC/DCC assets. *Id.* On January 21, 2014, all shares in Chrysler Group LLC were bought by Fiat, which soon afterwards changed the name of Chrysler Group LLC to FCA US LLC.[2] (Dkt. # 24-51, Pg ID 2199). Because of these changes in Chrysler's ownership and organizational structure, CC/DCC no longer exists and therefore would be unable to enforce any contractual time bar right.[3]

---

[1] Chris Isidore, *Chrysler Files for Bankruptcy*, CNN Money (May 1, 2009, 3:58 AM), http://money.cnn.com/2009/04/30/news/companies/chrysler_bankruptcy/.

[2] Rachel Abrams, *Fiat Completes Acquisition of Chrysler*, The New York Times DealBook (Jan. 21, 2014, 12:57 PM), https://dealbook.nytimes.com/2014/01/21/fiat-completes-acquisition-of-chrysler/.

[3] Relying on *Virchow Krause & Co. v. Schmidt*, No. 266271, 2006 WL 1751835, at *3 (Mich. Ct. App. June 27, 2006), Defendants argue that the CC time-bar provision is assignable to Daimler AG/MBFS. However, *Virchow* focuses on the transferability of a non-compete agreement. The real issue before the Court is the scope of the time-bar provision when Plaintiff agreed to it in her employment application. Even if the Court considers transferability in the current case, *Virchow* is factually distinguishable because the CC and Daimler-Benz merger occurred before Plaintiff agreed to the time-bar

Defendants' argument as to the time bar issue fails.

## B. Prima Facie Case of Retaliation

Plaintiff does not claim to have direct evidence of retaliation and offers only circumstantial evidence. Title VII retaliation claims supported by circumstantial evidence are analyzed using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation, which consists of four elements: (1) the plaintiff engaged in protected activity; (2) the defendant had knowledge of the plaintiff's protected activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.* If the plaintiff establishes her prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant produces such a legitimate reason, then the burden of production returns to the plaintiff to rebut the defendant's proffered reasons by showing them to be pretextual. *Id.* at 675.

In this case, the parties do not dispute that the third element of Plaintiff's prima facie case has been met. The termination of Plaintiff's employment with Defendant MBFS on November 8, 2016 was an adverse employment action. The parties dispute the first, second, and fourth elements.

---

provision in her employment application. In contrast, in *Virchow*, a pre-existing non-compete agreement was transferred to a new owner.

### 1.  Protected Activity

Defendants argue that Plaintiff's complaints about Berry were not protected activity because they were about his incivility toward both men and women, and not specifically about gender discrimination.  Plaintiff responds that her complaints, and MBFS's own investigation preceding Berry's written warning, revealed a hostile work environment based on sex, which included Berry's gender-based slurs, insistence that female employees drink with him at a bar, and touching a female's butt area and/or thighs in the presence of other colleagues.  Plaintiff maintains that Berry's use of non-gender based profanity and other poor behavior as a manger did not negate her discrimination complaints.

There is a genuine dispute as to whether Plaintiff's complaints to HR about Berry's behavior on July 25, 2014 constituted protected activity.  The underlying conduct being complained about need not be unlawful; the real question is whether "Plaintiff held an objectively reasonable and good faith belief" that the conduct was unlawful.  *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016).  This analysis should consider "the effects of the conduct on the victim-recipient" and not "focus[] too narrowly on motivation for the harassers' offensive conduct."  *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 272 (6th Cir. 2009).

Relying on *Blizzard v. Marion Tech. Coll.*, Defendants argue that Plaintiff did not take an "overt stand against suspected illegal discriminatory action."  698 F.3d 275, 288 (6th Cir. 2012) (internal quotation marks and citations omitted).  In *Blizzard*, this requirement was meant to avoid "vague charge[s] of discrimination."  *Id.* (quoting

18

*Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).  In

*Booker*, an employee inserted a claim of "ethnocism" into a letter to HR, responding to

complaints about his managerial style, which otherwise blamed his supervisor.  *Id.* at

1309.  Because of this context, "*Booker* does not . . . require that the plaintiff's complaint

be lodged with absolute formality, clarity, or precision."  *Yazdian v. ConMed Endoscopic*

*Techs.*, 793 F.3d 634, 645 (6th Cir. 2015) (quoting *Stevens v. Saint Elizabeth Med. Ctr.,*

*Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)).  In *Booker*, the court was not clear about

what the term "ethnocism" even meant.  *See Booker*, 879 F.2d at 1313 n.4.  In contrast,

in the current case, Plaintiff reported several specific examples of Berry's conduct.  *See,*

*e.g.*, Dkt. # 24-7, Pg ID 1419.

      In the current case, viewing the facts in the light most favorable to Plaintiff, there

is reason to believe that the purpose of Plaintiff's complaints to HR about Berry was to

notify HR of gender discrimination and sexual harassment.  Plaintiff testified that she

complained to HR about gender discrimination and about Berry's conduct toward

women several times, which included Berry demeaning, talking down to, and swearing

at women.  (Dkt. # 16-2, Pg ID 154, 155-56, 159-61, 168, 187).  Relying on *Richmond-*

*Hopes v. City of Cleveland*, No. 97-3595, 1998 WL 808222, at *5 (6th Cir. Nov. 16,

1998), Defendants argue that Berry's actions were not "because of sex" but rather

reflect "belligerence."  In *Richmond-Hopes*, the plaintiff's supervisor once called her a

"bitch" while "mimicking masturbation" and saying, "stroke me."  *Id.*  However, the

plaintiff had seen the supervisor "make this gesture before to at least one other male

employee."  *Id.*  Without additional evidence, the court found no sexual discrimination.

In the current case, Berry only directed the word "bitch" at his female colleagues.  *See*

Dkt. # 24-7, Pg ID 1419.  There are no incidents of the term used against any male coworker in the record.  In addition to Plaintiff's testimony from her deposition, there is specific mention of "bitch" "referring to a female" in Mary Hughes' notes from the July 25, 2014 meeting with Plaintiff.  (Dkt. # 16-2, Pg ID 311).  Additionally, Plaintiff and Sesny both reported to HR that Berry slapped the butt and/or placed his hand on the thigh of Carpenter, his female supervisee (a specific complaint that goes beyond mere reporting of an alleged affair), and there are no allegations of Berry touching the butt area of male coworkers in a professional setting.  Therefore, a reasonable jury could conclude that Plaintiff did take an overt stand against suspected illegal discriminatory action based on gender.

Unlike in other cases cited by Defendants, Plaintiff reported to HR that Berry used the word "bitch" in reference to several women in this case.  In *Kriss v. Sprint Commc'ns Co., Ltd. P'ship*, 58 F.3d 1276, 1281 (8th Cir. 1995), a manager stated that a woman in the office was a "bitch."  The court recognized that if the word "bitch" were used regularly as a synonym for "complain," it would serve as evidence that a manager associated complaining with females and had a sex-based animus, and/or improperly discriminated.  *See id.*  In this case, there is evidence in the record that Berry used the word "bitch" several times openly in the workplace as a synonym for "difficult," "spiteful," and/or "overbearing" following professional disagreements with female colleagues.[4]

---

[4] *Cf. Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 297-98 (6th Cir. 2015) (finding that the plaintiff's supervisor once calling herself "the bitch in charge" was not "automatically discrimination because of sex merely because the word[] used [had] sexual content or connotation") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (internal quotations marks omitted)).

Therefore, a jury could reasonably conclude that Berry associated women with being difficult, spiteful, and/or overbearing, and that he had a sex-based animus.[5]

At this stage, the Court finds that there was a reasonable basis for Plaintiff to believe that Berry had an illegal discriminatory animus against women. Although the nature of Plaintiff's complaint could have been more precise, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff made a complaint against Berry for gender-based discrimination. A reasonable jury could further conclude that Plaintiff's complaints were specific enough such that MBFS should have reasonably understood that Plaintiff was complaining of gender discrimination and sexual harassment. Indeed, there is some evidence that MBFS considered Plaintiff's complaints to be sexual harassment complaints because Mary Hughes requested that Daimler AG's BPO begin an investigation into Berry's conduct in July 2014, per MBFS's Equal Employment Opportunity Harassment Policy cited above (the only policy in the record that requires the kind of investigation that was conducted into Berry's conduct).[6]

---

[5] Lastly, Defendants' reliance on *Barnett v. Dep't of Veteran Affairs*, 153 F.3d 338 (6th Cir. 1998), to argue that Berry's use of "bitch" was not sex animus is misplaced. In *Barnett*, the Sixth Circuit did not make any findings regarding whether use of the word "bitch" was indicative of sex-based animus. The Sixth Circuit merely deferred to the trial court's finding that a witness's statement that the plaintiff's supervisor called her a "bitch" was not credible. *Id.* at 342-43. Here, at the summary judgment phase, the Court will make all credibility inferences in favor of Plaintiff as the non-moving party. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Berry's repeated use of the word "bitch" toward several women went beyond a mere personal conflict with Plaintiff and was indicative of sex-based animus.

[6] The Court further notes that Defendants acknowledged that, prior to Plaintiff's complaints, they had never investigated a sexual harassment, gender discrimination, or retaliation complaint. *See* Dkt. # 16-13, Pg ID 777-78; Dkt. # 16-6, Pg ID 378; Dkt. # 16-8, Pg ID 437-38. Weinig, who Defendants argue was the ultimate decision maker, testified that he did not know whether MBFS policies and/or Michigan laws regarding

Plaintiff further argues that her retaliation complaints were protected activities. Plaintiff testified that she complained to Ballard of retaliation and referred to herself as a "whistleblower" in October 2015. Viewing the facts in the light most favorable to Plaintiff, she testified that Carpenter, as Berry's lover, was retaliating against Plaintiff because Plaintiff complained about Berry's behavior toward women in 2014. *See* Dkt. # 16-2, Pg ID 178. In April 2016, Plaintiff again complained to Ballard that Carpenter was retaliating against Plaintiff based on Plaintiff reporting Berry's misconduct and Carpenter's continued romantic relationship with Berry, as well as Carpenter feeling that Plaintiff was responsible for Berry's termination in February 2016. *See* Dkt. # 24-27, Pg ID 1875-76; Dkt. # 24-28, Pg ID 1878. Even if Ballard did not already know of the nature of Plaintiff's 2014 gender discrimination complaints, Plaintiff's use of legally significant terms including "retaliation" and "whistleblower" would have suggested to Ballard that the subject of Plaintiff's complaints was subject to legal protection. *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015). Ballard reported Plaintiff's retaliation complaints to Mary Hughes and Castelvetere, and Castelvetere acknowledged in her deposition testimony that Plaintiff's complaints of retaliation should have been investigated, yet they were not. The Court finds that, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff's retaliation complaints were also protected activity.

---

sexual harassment, sex discrimination, and/or retaliation even existed. (Dkt. # 16-13, Pg ID 777). Atkinson, the HR Representative who was in charge of conducting the investigation into Berry's conduct following Plaintiff's complaint, testified that she did not even follow up on investigating reports of Berry touching his supervisee's butt area (before the rumors of the alleged affair were confirmed). (Dkt. # 16-8, Pg ID 447-48).

## 2. Knowledge of Protected Activity

To satisfy this prong, a plaintiff must show that the official committing the adverse action knew of the plaintiff's exercise of protected activity. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999); *Brown v. City of Franklin*, 430 F. App'x 382, 386 (6th Cir. 2011) (unpublished). Defendants argue that Plaintiff has not produced specific evidence showing that the decision makers involved in her termination knew of her complaints and that they involved protected activity. The employees who attended the November 7, 2016 meeting preceding Plaintiff's termination are: Ballard, Carpenter, Weinig, and Liu. (Dkt. # 24-24, Pg ID 1775). Plaintiff responds that, given their role in HR, Ballard and Castelvetere (Ballard's manager) knew of Plaintiff's complaints of gender discrimination and retaliation. Plaintiff argues that, given Ballard and Castelvetere's influence in the decision to terminate Plaintiff, it can be inferred that decision makers Carpenter, Weinig, and Liu also knew of Plaintiff's complaints and that they related to protected activity.

A decision maker's "knowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action." *Hicks v. SSP Am., Inc.*, 490 F. App'x 781, 785 (6th Cir. 2012) (quoting *Mulhall v. Ashcroft*, 287 F.3d 543, 553 (6th Cir. 2002)). A reasonable jury could make this inference when the plaintiff produces evidence that such prior interactions make it "highly improbable" that the individual who knew of the plaintiff's protected activity did not share this information with the second individual who actually took the adverse employment action as soon as the first individual obtained the information. *Mulhall*, 287 F.3d at 553 (citing *Kralowec v. Prince George's Cnty., Md.*, 503 F. Supp. 985, 1009-10 (D. Md. 1980), *aff'd*, 679 F.2d 883 (4th Cir. 1982), *cert.*

*denied*, 459 U.S. 872 (1982)).  Alternatively, a decision maker's knowledge of the plaintiff's protected activity can be inferred when the decision maker has relied upon a flow of information that the plaintiff's supervisor has adversely affected with his/her discriminatory animus.  *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008).  This would cause the decision maker to "act[] as the conduit of the supervisor's prejudice."  *Id.* (quoting *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 877 (6th Cir.2001) (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990))) (internal brackets omitted).

In *Hicks*, the plaintiff's direct supervisor testified that a second supervisor told him that the plaintiff was "filing for discrimination" and that he "remembered seeing" the charges.  490 F. App'x at 785.  The court found that these two supervisors knew of the charges and imputed their knowledge to a third supervisor (who actually made the decision to terminate the plaintiff) who was friends with the first and second supervisors and directly supervised them during the relevant time period.  *Id.*  In the *Mulhall* case, the court found insufficient evidence to impute knowledge from an official who allegedly had knowledge of the plaintiff's protected activity to the officials who told the plaintiff's supervisor to investigate the plaintiff's time and attendance, which led to the plaintiff being reassigned.  287 F.3d at 553.  In reaching this decision, the court distinguished the case from *Kralowec* (in which the court did impute knowledge) because the official who allegedly had knowledge in *Mulhall* had not participated in the adverse employment action.  *Id.*  Whereas in *Kralowec*, the official with knowledge had "participated in drafting the charges against the plaintiff that resulted in her discharge."  *Id.*; *see* 503 F. Supp. at 1009.

Based on Plaintiff's testimony regarding her July 25, 2014 and October 20, 2014 meetings with HR and the HR notes from these meetings, there is evidence that Mary Hughes knew of the protected nature of Plaintiff's complaints.  Viewing the facts in the light most favorable to Plaintiff, Hughes had direct knowledge of Plaintiff's protected activities.  Although Ballard did not work for MBFS at the time, Hughes, the head of HR, did.  (Dkt. # 16-12, Pg ID 626).  Given the nature of the supervisory relationship between Ballard and Hughes, there were repeated interactions between them, including discussing Plaintiff's claims of retaliation.   (Dkt. # 16-2, Pg ID 178; Dkt. # 16-12, Pg ID 707).  Therefore, Ballard's knowledge of Plaintiff's protected activity can be reasonably inferred from Hughes' knowledge.  *See Hicks*, 490 F. App'x at 785.

Additionally, Plaintiff testified that she had to recap and reiterate her complaints several times because it seemed like there was always someone new in the HR department (in reference to Ballard).  (Dkt. # 16-2, Pg ID 144).  She testified that when she first met with Ballard, she had to go back to reiterate past events that had taken place. *Id.* at Pg ID 155.  Plaintiff further testified that she reported to Ballard on two occasions that Berry and Carpenter retaliated against her.  *Id.* at Pg ID 178, 186, 189, 222.  Plaintiff specifically stated to Ballard that she felt Berry and Carpenter's conduct toward her constituted "retaliation" because Plaintiff was the "whistleblower" who complained about Berry's conduct initially.  *Id.* at Pg ID 178, 183, 186, 222.  Again, even if Ballard did not already know of the nature of Plaintiff's gender discrimination complaints through Mary Hughes, Plaintiff's use of these legally significant terms would suggest to Ballard that Plaintiff's complaints were subject to legal protection.  *See Yazdian*, 793 F.3d at 646. Although Ballard has no written record of Plaintiff using the term "whistleblower," Plaintiff's

deposition testimony raises a genuine dispute on the matter, which must be resolved in Plaintiff's favor at this stage.   Viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury could conclude that Ballard knew of Plaintiff's protected activity.

In addition to HR, Plaintiff's deposition testimony indicates that other MBFS employees knew of a connection between Plaintiff and Berry's termination.  First, Plaintiff communicated her concerns about Berry's inappropriate conduct toward women to Robinson a week before her original complaint to HR.  (Dkt. # 16-2, Pg ID 132-33).  Additionally, after Berry was terminated, Fulton indicated to Plaintiff that he thought Plaintiff must be glad about the termination.  *Id.* at Pg ID 177.  One of Plaintiff's coworkers, Amera, was also openly telling other coworkers in a group forum that Plaintiff was the reason that Berry got fired.  *Id.* at Pg ID 169-70.  Plaintiff actually confronted Amera, who responded that she heard it from another coworker, Caroline Watha, who heard it from Carpenter.  *Id.* at Pg ID 170, 177.

Additionally, the small size and history of the MBFS insurance department would make it easier for Carpenter and Berry to determine who made the complaint against Berry.   There were a small number of people who had the opportunity to observe the behavior that was the subject of the complaint.  (Dkt. # 16-10, Pg ID 509).   The listed incidents repeat the same names under "who observed": Trump, Sesny, Plaintiff, and Carpenter.  (Dkt. # 34-2, Pg ID 1419).  Even if the specific incidents were never discussed with Berry, the written warning itself suggests the complaint was made by a team member who worked in the same "office environment" as him.  *See* Dkt. # 34-6.  This team member would have been Trump, Sesny, Plaintiff, or Carpenter.  Because Plaintiff was the most

recent addition to Berry's department and there was no history of complaints beforehand, it can be reasonably inferred that he would suspect her.  *See* Dkt. # 16-10, Pg ID 495-96. According to Plaintiff's deposition testimony, Berry's conduct toward her after the written warning indicated that he knew Plaintiff had made the complaint.  Examples included ignoring Plaintiff and requiring her to use vacation time for appointments.  (Dkt. # 16-2, Pg ID 167).  Furthermore, Carpenter and Berry's romantic relationship existed during the entirety of Plaintiff's employment in the MBFS insurance group, making it likely that Berry discussed with Carpenter whatever he knew regarding Plaintiff and the complaints against him.  In an e-mail chain between Carpenter and Berry, Carpenter wrote to Berry, in reference to Plaintiff, "U probably would have used that C word too."  (Dkt. # 24-15, Pg ID 1565-66).[7]  This email indicates that Carpenter was aware of Berry's animosity toward Plaintiff and shared in it.

The Court also finds that a reasonable jury could impute Ballard's knowledge about Plaintiff's gender discrimination and retaliation complaints to Carpenter.  Carpenter was in regular communication with HR about Plaintiff.  First, Carpenter was interviewed by HR in October 2014 related to Plaintiff's original complaint.  (Dkt. # 16-11, Pg ID 548). According to Carpenter's deposition testimony, although HR did not directly communicate to her that they were investigating Berry's behavior because of Plaintiff's complaint, Carpenter understood that HR was evaluating Berry's leadership of the insurance department.  Then, on October 19, 2015, Ballard emailed Carpenter about Plaintiff making a complaint based on the reorganization of the insurance department.  This was

---

[7] Likely referring to the word "cunt" based on the profanity included earlier in the e-mail chain, including "bitch."

the same day that Plaintiff made the retaliation complaint to Ballard.  (Dkt. # 24-21, Pg ID 1698-99).  Additionally, Ballard recommended that Carpenter place Plaintiff on a PIP. While Ballard and Carpenter did not have a supervisory relationship, there is evidence from which a jury could conclude that Ballard supervised or oversaw Carpenter's drafting and implementation of Plaintiff's PIP, making sure the problematic behavior identified as well as the expected behavior were sufficiently specific.  (Dkt. # 16-19, Pg ID 1112; Dkt. # 16-11, Pg ID 588).  Based on her significant involvement in giving Plaintiff a PIP as well as her presence at the November 7, 2016 meeting preceding Plaintiff's termination, unlike the official who the plaintiff tried to impute knowledge from in *Mulhall*, Ballard did participate in the adverse employment action. Indeed, when Weinig suggested Plaintiff be issued a written warning for the November 4 incident with Sesny, it was Ballard and Carpenter who advocated for Plaintiff's termination, arguing that a written warning would not suffice, despite the fact that Plaintiff had no disciplinary record and had never been issued a written warning.  A reasonable jury could conclude that Ballard and Carpenter communicated regularly about Plaintiff, and that Ballard would have discussed Plaintiff's protected complaints with Carpenter as soon as she obtained that information.

Furthermore, the Court finds that a reasonable jury could in turn impute Carpenter's knowledge about Plaintiff's gender discrimination and retaliation complaints to Weinig and Liu.  According to Weinig's declaration and Liu's deposition, they were the ultimate decision makers regarding Plaintiff's termination.  (Dkt. # 16-14, Pg ID 832; Dkt. # 16-16, Pg ID 938).  In *Madden*, the senior managers who fired the plaintiff relied upon information provided by his direct supervisor when deciding to terminate him.  549 F.3d at 678.  The plaintiff's direct supervisor reported misbehavior by the African American

28

plaintiff to senior management but did not report the same misbehavior by white employees. *Id.* Because of this inconsistent reporting, the court found that the direct supervisor had a discriminatory (racial) animus, which was imputed to the senior managers. *Id.* The court concluded that by relying on the discriminatory information flow, the senior managers acted as the conduit of the supervisor's prejudice, "his cat's paw." *Id.* (quoting *Christian*, 252 F.3d at 877 (quoting *Shager*, 913 F.2d at 405)) (internal brackets omitted). In the current case, Weinig and Liu relied upon information provided by Carpenter, Plaintiff's direct supervisor, when deciding to terminate her, and a reasonable jury could conclude that Weinig and Liu relied on information flow tainted by Carpenter's retaliatory animus against Plaintiff.

As previously discussed, there is reason to believe that Carpenter had knowledge of Plaintiff's protected complaints, which ultimately led to Berry, the person Carpenter was in a romantic relationship with, being fired. Based on Carpenter's vulgar e-mail exchange with Berry, there is evidence of some preexisting animus on both of their parts toward Plaintiff. Furthermore, as discussed in more detail below, there is evidence that Carpenter treated Plaintiff more harshly than Sesny, a similarly situated employee, after Berry was fired. While Plaintiff received a PIP after the March 24, 2016 incident and was terminated after the November 4, 2016 incident, Sesny did not receive any warning, discipline, or PIP after either incident. Additionally, despite Plaintiff's sixteen-year history of good performance and Plaintiff's successful completion of her PIP, Carpenter took the position that Plaintiff's behavior would not improve and that a written warning would be insufficient at the November 7 meeting with Weinig and Liu. The Court finds that a reasonable jury could determine that Carpenter had retaliatory animus against Plaintiff

and intentionally portrayed Plaintiff in the worst possible light in front of Weinig and Liu. *See Shager*, 913 F.2d at 405.

A reasonable jury could further conclude that Weinig and Liu became a conduit of Carpenter's retaliatory animus against Plaintiff. Following the November 4, 2016 incident, Weinig briefly heard from both Plaintiff and Sesny. (Dkt. # 16-13, Pg ID 817). Liu was not aware of the details of the incident. (Dkt. # 16-16, Pg ID 952). According to Weinig and Liu's depositions, the incident by itself was not necessarily a terminable offense. *See* Dkt. # 16-13, Pg ID 825; Dkt. # 16-16, Pg ID 952. At the November 7 meeting, Weinig initially wanted to issue a written warning to Plaintiff. (Dkt. # 16-11, Pg ID 609). However, Carpenter considered a warning insufficient, and Weinig and Liu relied upon information provided by Carpenter in deciding to terminate Plaintiff. Additionally, Carpenter had prepared Plaintiff's PIP following the March 24, 2016 incident. Neither Weinig nor Liu were present for the incidents listed on the PIP or independently investigated them. *See* Dkt. # 16-13, Pg ID 808; Dkt. # 16-16, Pg ID 940. Because she was present for and/or investigated the PIP incidents and was Plaintiff's direct supervisor, Carpenter was in a position to heavily influence Weinig's and Liu's decisions on any disciplinary action for Plaintiff. *See Shager*, 913 F.2d at 405 (finding that the plaintiff's direct supervisor may well have been decisive based on how he portrayed the plaintiff in the worst possible light in front of the committee that fired the plaintiff).

### 3. Causal Connection Between the Protected Activity and the Adverse Employment Action

Defendants argue that too much time passed between Plaintiff's complaints and the adverse employment actions to raise a causal inference, and that intervening events undermine any causal link. Plaintiff responds that she had no behavior problems to warrant a termination and that intervening events assist in establishing causation — specifically, Berry's termination two months before Plaintiff was put on a PIP, and Berry having to sell his house one month before Plaintiff's termination. Plaintiff further argues that Sesny, a similarly situated employee, was treated more favorably than Plaintiff. Defendants reply that there is no authority to support measuring temporal proximity from events outside of the protected activity and that Sesny did not engage in similar conduct to Plaintiff.

The Supreme Court has held that Title VII retaliation claims require proof that the desire to retaliate was the "but-for" cause of the challenged employment action. *Nassar*, 570 U.S. at 360; *see also E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1070 (6th Cir. 2015) (noting that cat's paw liability in the retaliation context requires a showing that the non-decision maker's retaliatory actions were a but-for cause of the decision maker's decision to take the adverse action). "[E]vidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Where an adverse employment action "occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* For example, in *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986), the Sixth Circuit found that the mere fact that the plaintiff was discharged four months after filing a discrimination claim was insufficient to support an inference of retaliation without any other evidence of causation. Additionally, an "intervening legitimate reason to discipline . . . dispels an inference of retaliation based on temporal proximity." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012). In *Wasek*, the legitimate reason was the plaintiff leaving the job site without permission after making a complaint of "sexual touching" to a supervisor. *Id.* at 466, 472.

In this case, Defendants are correct that temporal proximity is measured from the time an employer learns of a protected activity to the time of the subsequent adverse employment action. *See Mickey*, 516 F.3d at 525. Plaintiff maintains that she complained of gender discrimination in July and October 2014. A year later, she first complained of retaliation to Ballard after her department was reorganized in October 2015. Over five months later, in April 2016, Carpenter put Plaintiff on a PIP with input from Ballard, and Plaintiff complained to Ballard that the PIP was retaliation. Over six months later, Plaintiff was terminated in November 2016. Because of the amount of time that elapsed between

32

Plaintiff's protected activities and the subsequent adverse employment actions, Plaintiff cannot rely on temporal proximity alone.  *See id.*; *Cooper*, 795 F.2d at 1272.

However, the Court finds that Plaintiff has coupled temporal proximity with other evidence of retaliatory conduct on the part of Carpenter. Before making her initial complaint in July 2014, Plaintiff's performance at MBFS had been evaluated as "Excellent" for Appraisal Years 2006 through 2014.  (Dkt. # 24-3, Pg ID 1218-34).  In the sixteen years prior to the July 2014 complaint, Plaintiff never received any discipline or warning, nor did she have any documented performance problems.  All of the problems at issue in this case occurred in the two years after Plaintiff complained of gender discrimination, in the one year after Plaintiff initially complained of retaliation, and in the seven months after Plaintiff complained of retaliation a second time.  As discussed above, viewing the facts in the light most favorable to Plaintiff, Carpenter knew that Plaintiff complained about Berry in July and October 2014 and blamed her for Berry's eventual termination in February 2016.  Two months after Berry's termination, Carpenter placed Plaintiff on a PIP in April 2016.   Seven months later, Carpenter participated in the November 7, 2016 meeting preceding Plaintiff's termination.  Weinig wanted to issue a written warning to Plaintiff; however, specifically because of the PIP, Carpenter argued that a written warning would be insufficient and that Plaintiff's behavior would not change—despite the fact that Plaintiff had successfully completed her PIP a few months earlier, and despite the fact that Plaintiff had not received any prior "written warning" or "final warning" as outlined in MBFS's Corrective Action Policy.  *See* Dkt. # 24-8, Pg ID 1421.  As discussed in the previous section, Weinig and Liu relied heavily on Carpenter's input in deciding to terminate Plaintiff.  Viewing the facts in the light most favorable to

Plaintiff, a reasonable jury could conclude that Carpenter's retaliatory PIP (discussed in more detail below) and her negative input at the meeting were but-for causes of Plaintiff's termination, and that Weinig and Liu became a conduit of Carpenter's retaliatory animus against Plaintiff.

Additionally, the Court finds that, viewing the facts in the light most favorable to Plaintiff, Defendants treated Plaintiff much more harshly than Sesny, a similarly situated employee who was involved in both the March 24, 2016 incident that resulted in Plaintiff's PIP and the November 4, 2016 incident that resulted in Plaintiff's termination—which is further evidence that is relevant to causation.

In considering whether there is a 'true' comparator, courts consider whether the employees: (1) share an "ultimate decision-maker," *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005); (2) are subject to the same standards, *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); and (3) engaged in conduct that was similar in kind and severity, *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). The plaintiff need not demonstrate an exact correlation with the employee with whom the plaintiff seeks to compare herself. The plaintiff must only show the two employees are similar in "all of the relevant aspects." *Id.* (quotations omitted). In making this evaluation, the court should consider any "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*

In this case, it is undisputed that Plaintiff and Sesny shared ultimate decision makers and were subject to the same standards; Defendants, however, argue that Plaintiff and Sesny did not engage in similar conduct. In *Clayton*, the African American

plaintiff drove his truck away while the dock plate was still in place, injuring a coworker. *Id.* at 608. In considering whether other white truck drivers who had engaged in similarly negligent acts were "true" comparators, the court found it appropriate to consider that "only [the plaintiff's] negligence caused serious injury to a coworker." *Id.* at 608, 612. In contrast, given their history of interpersonal difficulties, a reasonable jury could find that both Plaintiff and Sesny were disruptive and hurt team morale. Viewing the facts in the light most favorable to Plaintiff, both Plaintiff and Sesny complained about each other to Carpenter and were at least partially at fault for the March 24 as well as the November 4 incidents. After Plaintiff complained that the PIP was retaliatory, Carpenter and Ballard received independent confirmation from an outside partner that Sesny was difficult to work with. (Dkt. # 24-27, Pg ID 1876). Nevertheless, Plaintiff received a PIP, and Sesny did not receive a PIP or verbal warning. Weinig testified that the interpersonal conflict between Plaintiff and Sesny had caused a lot of disruption and that both Plaintiff and Sesny were disruptive. (Dkt. # 16-13, Pg ID 817). According to Plaintiff's testimony regarding the November 4 incident, Sesny began yelling at Plaintiff in front of their coworkers. Nevertheless, Plaintiff was terminated, while Sesny did not even receive a verbal or written warning. Although Defendants claim that Plaintiff reacted more poorly to the disputes than Sesny, a reasonable jury could find that Sesny was similarly situated, and that Plaintiff was treated much more harshly than Sesny. *See Coleman v. Donahoe*, 667 F.3d 835, 846-47 (7th Cir. 2012) ("Whether a comparator is similarly situated is usually a question for the fact-finder.").

The Court concludes that Plaintiff has sufficiently established a causal connection between her protected activity and her termination, as well as her prima facie case.

### 4.  Pretext

The burden of production now shifts to Defendants to articulate a legitimate, non-discriminatory reason for terminating Plaintiff.  *Fuhr*, 710 F.3d at 674-75.  Defendants have offered that the reoccurrence of Plaintiff's unprofessional behavior toward Sesny on November 4, 2016 after being on a PIP for similar behavior was the reason she was terminated.  Defendants point to MBFS's PIP policy, which indicates that an employee can be terminated for the reoccurrence of behaviors addressed by a PIP.

Because Defendants have articulated a legitimate, non-discriminatory reason for the termination, the burden of production returns to Plaintiff to rebut them by showing them to be pretextual.  *Id.* at 675.  According to Plaintiff, had she never received the false and retaliatory PIP from Carpenter, she would not have been terminated.  Plaintiff argues that there is insufficient evidence to support her receiving a PIP, and that Defendants did not follow their own policies in placing her on a PIP and later terminating her employment.  Defendants maintain that Plaintiff should not second-guess their interpretation of company policies and business judgment to discipline Plaintiff and not Sesny.

Plaintiff can demonstrate Defendants' proffered legitimate reason is a pretext for retaliation by showing their reason (1) has no basis in fact; (2) did not actually motivate their adverse employment actions; or (3) was insufficient to warrant the challenged adverse employment actions. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).  When evaluating an employer's departure from their stated policy, its probative value depends on its context.  *See DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 394 (6th Cir. 2005); *see also Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414,

421-22 (6th Cir. 1999).   Furthermore, in Title VII cases, the Sixth Circuit has "never adopted a 'business-judgment rule'" which would require deference to an employer's "reasonable business judgment" because "the very issue in dispute is whether the employer's adverse employment decision resulted from an objectively unreasonable business judgment, *i.e.*, a judgment that was based upon an impermissible consideration . . . ."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 n.6 (6th Cir. 2008).   Rather, "whether the employer's judgment was reasonable or was instead motivated by improper considerations is for the *jury* to consider."  *Id.* (emphasis in original).

The Court finds that a reasonable jury could conclude that, had Plaintiff never received the retaliatory PIP from Carpenter, she would not have been terminated.   As discussed above, Weinig and Liu did not see the November 4 incident by itself as necessarily a terminable offense, and Weinig initially wanted to issue Plaintiff a written warning.   However, specifically because of the PIP, Carpenter and Ballard argued that a written warning would be insufficient and that they did not expect Plaintiff's behavior to change.

The Court further finds that, viewing the facts in the light most favorable to Plaintiff, the PIP was a pretext for retaliation.   Defendants have stressed that Plaintiff was placed on a PIP due to "performance issues" and not to any discipline or behavioral issues. Indeed, it is undisputed that there is no record of any disciplinary action against Plaintiff throughout her sixteen-year career.   However, the laundry list of performance issues that appear on the PIP is nowhere to be found in the many documented performance evaluations in Plaintiff's record from 2006 until her termination in 2016.  *See* Dkt. # 24-3. These performance evaluations rate Plaintiff's performance as "Excellent" from 2006 to

2014 and "Successful" from 2015 to 2016.[8]  The performance evaluations are replete with praise for Plaintiff's abilities to:  build effective working relationships; communicate effectively; demonstrate and support top performance; take responsibility; demonstrate accountability and credibility; contribute to a work culture of respect, enthusiasm, inspiration, and dedication; seek and respond to feedback; and work effectively in a team.[9]  A reasonable jury could find there to be suspicious inconsistencies between issues documented as the reasons for Plaintiff's PIP and Plaintiff's performance evaluations.

Furthermore, there is evidence that Sesny (and perhaps others in the insurance department) had issues with communication and collaboration, yet Plaintiff was the only one to be placed on a PIP.  Plaintiff's PIP mentions a complaint from a vendor about Plaintiff.  Similarly, Jackie Foster complained about Sesny to Carpenter, yet Sesny was not placed on a PIP.  As discussed above, accepting Plaintiff's version of events as true, a jury could conclude that a reasonable employer would have found that Plaintiff and

---

[8] Based on when the evaluations are performed, the transition from "Excellent" (2014) to "Successful" (2015) performance ratings for Plaintiff coincides with Berry receiving his written warning in October 2014.  Berry performed Plaintiff's evaluation for both years. (Dkt. # 24-3, Pg ID 1233-36).

[9] The only mention in any performance review regarding any issue addressed in Plaintiff's PIP is a comment about collaborating with her team members in the LEAD 2015 evaluation completed by Berry (the only evaluation completed by Berry following Plaintiff's complaints).  Even this sole mention indicates that the issue was broader than just Plaintiff, stating:  "Our entire team has committed to working in a collaborative manner and being more respectful toward one another.  This team commitment will be discussed and monitored during our weekly team meetings."  (Dkt. # 24-3, Pg ID 1235). This evaluation is the only one in which any of Plaintiff's Leadership Behaviors was rated lower than "Shown Continuously," (for Promoting a diverse culture of collaboration and learning).  However, Plaintiff's next LEAD evaluation completed by Weinig indicates that her performance in this area improved to "Shown Continuously."  *Id.* at Pg ID 1237.

Sesny were similarly situated and engaged in conduct that was similar in kind and severity.  If so, given that Defendants placed Plaintiff on a PIP but did not place Sesny on a PIP or discipline her in any way in March or November 2016, a jury could reasonable infer that Defendants' stated reason for placing Plaintiff on a PIP were pretextual.  Not only did Carpenter not place Sesny on a PIP, but Carpenter also testified that she has never placed anyone other than Plaintiff on a PIP.  (Dkt. # 16-11, Pg ID 534).  According to his deposition testimony, Liu had no understanding of why Carpenter placed Plaintiff on a PIP at the time of Plaintiff's termination.  *See* Dkt. # 16-16, Pg ID 940.  Likewise, Weinig's testimony indicates that he did not have a full understanding of why Carpenter placed Plaintiff on a PIP at the time of Plaintiff's termination.  *See* Dkt. # 16-13, Pg ID 808, 810, 812-15.

A reasonable jury could also conclude that Plaintiff did not engage in behavior that warranted termination.  Ballard testified that, according to intern Spencer Frania's notes regarding the November 4 incident, Plaintiff did precisely what management instructed her to do in her PIP when addressing interpersonal conflicts with Sesny.  *See* Dkt. # 16-12, Pg ID 679.  This is consistent with Plaintiff's testimony about the November 4 incident. Viewing the facts in the light most favorable to Plaintiff, it was Sesny who has yelling at Plaintiff on November 4, yet Defendants did not terminate Sesny, nor did they place her on a PIP or issue her a warning of any kind.  Lastly, Liu's testimony indicates that, prior to the November 7 meeting, he knew of no reason to terminate Plaintiff and that he had no problems with her.  *See* Dkt. # 16-16, Pg ID 942.

The Court also notes that, regardless of Defendants' characterization, a reasonable jury could determine that Plaintiff was not terminated due to any performance

issue, but rather, due to a behavioral issue,[10] and that Defendants failed to follow their own Corrective Action Policy.  That policy indicates that Defendants maintain a progressive discipline policy to address behavioral issues and that, before terminating an employee, Defendants generally provide a verbal warning, followed by a written warning, followed by a final warning.  (Dkt. # 24-8, Pg ID 1421).  Defendants did in fact issue a written warning to Berry and a final written warning to Carpenter.  (Dkt. # 34-6, Pg ID 2307; Dkt. # 42-1, Pg ID 2408).  However, Defendants never issued Plaintiff a written warning or final written warning, nor did they document any reason for terminating Plaintiff in writing.[11]  Defendants' failure to follow their Corrective Action Policy in Plaintiff's case is additional evidence of pretext for the jury to consider.  *See DeBoer*, 124 F. App'x at 394.

Relying on *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558-59 (6th Cir. 2009), Defendants argue that the Court should not question its business judgment in determining to fire Plaintiff.  However, in *Sybrandt*, this reliance on the employer's business judgment was based on the employer's "reasonably informed and considered decision" following a thorough investigation with no indication that the process used to investigate the plaintiff was irregular or idiosyncratic.  *Id.* at 559; *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (rejecting the "honest belief" rule to the extent it credits an employer's belief without requiring that it be reasonably based on particularized

---

[10] Carpenter's deposition testimony indicates that the issues listed on Plaintiff's PIP were not related to performance; rather, they were behavioral in nature.  *See* Dkt. # 16-11, Pg ID 590-91.

[11] Even if the PIP is considered a written warning, MBFS's Corrective Action Policy indicates that MBFS generally provides a final written warning before deciding to terminate an employee.

facts).  Based on Weinig and Liu's reliance on Carpenter's input in making their decision to terminate Plaintiff, without an understanding of the reasons for Plaintiff's PIP or the history between Plaintiff and Sesny and without a full investigation, a reasonably jury could determine that Plaintiff's termination was not properly informed and instead motivated by improper considerations.

### C.  Carpenter's Individual Liability

Defendants correctly argue that Title VII does not permit liability against Carpenter as an individual employee.  Plaintiff responds that had Carpenter sought concurrence in support of dismissing her as a named Defendant, Plaintiff would have voluntarily dismissed her from this suit without prejudice.  Plaintiff notes that only counsel for Defendant MBFS sought concurrence.

Title VII makes it unlawful for "an employer" to discriminate "because of [an] individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). "Employer" includes "a person engaged in an industry affecting commerce who has fifteen or more employees . . . *and any agent of such person.*"  *Id.* at § 2000e(b) (emphasis added).  "The majority of the courts . . . have concluded the obvious purpose of this agent provision was to incorporate respondeat superior into the statue."  *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405-06 (6th Cir. 1997) (quoting *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir. 1993)) (quotation marks and brackets omitted).  In *Wathen*, the Sixth Circuit held that "an individual employee / supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII."  115 F.3d at 405.

Therefore, summary judgment in favor of Defendant Carpenter in her individual capacity is appropriate.

## IV.    DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S POST-BRIEFING SHAM AFFIDAVIT

Defendants filed their reply in support of their motion for summary judgment on May 30, 2018.  (Dkt. # 29).  Over two weeks later, on June 15, 2018, Plaintiff filed an "Affidavit of Shelley Garrett."  (Dkt. # 33).  Defendants then filed a Motion to Strike Plaintiff's Post-Briefing Sham Affidavit.  (Dkt. # 36).

Defendants argue that Plaintiff's affidavit is a sham that contradicts Plaintiff's earlier deposition testimony.  Defendants assert that Mary Hughes' disputed note about Plaintiff's original complaint comes from Hughes' conversation with Robinson, citing Hughes' deposition testimony.  Plaintiff, on the other hand, maintains that the note reflects her conversation with Hughes on July 25, 2014, citing her deposition testimony.  Regardless of how Hughes received this information, she knew that it was Plaintiff's complaint.  Hughes' immediate source might affect the credibility of the content of the note, but at this stage, the Court makes all credibility assessments in Plaintiff's favor.

Defendants also argue that Plaintiff's affidavit contains a new claim that Plaintiff communicated to HR that Berry had animus against women in general on July 25, 2014.  Defendants consider this a sham because Plaintiff never made this claim in her deposition.  Plaintiff counters that each relevant paragraph in her affidavit cites back to Plaintiff's deposition; that Defendants are too focused on the affidavit's specific word choice; and that the affidavit was meant to clarify Plaintiff's preexisting claims.

Lastly, Defendants find the affidavit procedurally improper because it was submitted after briefing and without leave of the court.  Plaintiff counters that the content of the affidavit is not inadmissible nor prejudicial to Defendants because it contains no new facts.

"Under the sham affidavit doctrine, after a motion for summary judgment has been made, a party may not file an affidavit that contradicts his earlier sworn testimony." *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016).  The doctrine "reflects the importance of distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact."  *Id.* at 624 (quoting *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)) (internal quotations and brackets omitted).

Although the wording of Plaintiff's affidavit may mischaracterize her earlier deposition testimony, the affidavit is not a sham.  Hughes' note, mentioned in Plaintiff's disputed affidavit, states "bitch – referring to *a female*," not "females".  (Dkt. # 16-2, Pg ID 311) (emphasis added).   Defendants argue that Plaintiff did not indicate that "Berry referred to women *in general* as bitches" in her deposition.  (Dkt. # 36, Pg ID 2343-44) (quotations omitted).  Plaintiff did not specifically point to Hughes' note in her deposition, other than to agree that most of the information that she reported to Hughes was reflected in the notes.  (Dkt. # 16-2, Pg ID 157).  However, she testified that she told HR that Berry "swears at us girls regularly."   *Id.* at Pg ID 161.  Additionally, according to Plaintiff's deposition testimony, the woman's buttocks that Berry allegedly slapped, belonged to Carpenter.  *Id.* at Pg ID 155-56.  Although Carpenter's name is omitted in the disputed affidavit, Plaintiff did mention complaining to HR about Berry slapping "a girl on the butt

at a conference" in her deposition.  *Id.* at Pg ID 187.  Plaintiff's related statements in her affidavit may confuse these facts when taken out of context; however, they do not directly contradict her deposition testimony.

Although Plaintiff's affidavit is not a sham, the Court will strike the document from the record because it was improperly filed.  While Rule 6(c)(2) of the Federal Rules of Civil Procedure requires that any affidavit supporting a motion be served with the motion "for the obvious purpose of getting all the materials out in a timely fashion, the rule also permits the court to allow a later filing of the affidavits."  *Int'l Techs. Consultants, Inc. v. Stewart*, No. 07-13391, 2012 WL 12991059, at *2 (E.D. Mich. Aug. 21, 2012).  However, because of its timing and wording, Plaintiff's disputed affidavit functions as a reply to Defendants' reply brief in which Plaintiff attempts to have the last word on whether her complaints constituted protected activity.  The affidavit responds to the issues raised in Defendants' reply brief and specifically cites it in paragraphs two and four.  According to our Local Rules, "a party must obtain leave of court to file more than one response to a motion for summary judgment."  E.D.  Mich. LR 7.1(c)(3).  A sur-reply filed without leave of court will be stricken from the record.  *Fox v. Riverdeep, Inc.*, No. 07-13622, 2009 WL 1506670, at *1 n.1 (E.D. Mich. May 26, 2009).

Plaintiff's affidavit is stricken from the record.  The Court has considered Plaintiff's related testimony and exhibits that were already a part of the record.

## V.    CONCLUSION

For the reasons set forth above, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment (Dkt. # 16); the motion is

granted only as to Defendant Carpenter in her individual capacity, and denied in all other

respects.  Accordingly, Defendant Carpenter is DISMISSED from this action.  The Court

also GRANTS Defendants' Motion to Strike Plaintiff's Post-Briefing Sham Affidavit (Dkt.

# 36) and STRIKES the Affidavit of Shelley Garrett (Dkt. # 33).

      SO ORDERED.

                          s/Nancy G. Edmunds
                          Nancy G. Edmunds
                          United States District Judge

Dated: September 13, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 13, 2018, by electronic and/or ordinary mail.

                          s/Lisa Bartlett
                          Case Manager